**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                )
THE WILDERNESS SOCIETY, et al., )
                                )
      Plaintiffs,               )
                                )
      v.                        )   Civil Action No. 98-2395 (RWR)
                                )
KEN SALAZAR,¹ Secretary of the  )
Interior, et al.,               )
                                )
      Defendants.               )
_____ )
```

**MEMORANDUM OPINION**

The Wilderness Society and seven other organizations filed this lawsuit against the Secretary of the Interior, the Bureau of Land Management ("BLM"), and the Fish and Wildlife Service ("FWS") challenging the decision by the Secretary to conduct oil and gas leasing in an area of the National Petroleum Reserve-Alaska ("NPR-A").  Plaintiffs filed a motion for partial summary judgment on Counts II through IV, VII and VIII of their first amended complaint, arguing that the Environmental Impact Statement violates the National Environmental Policy Act of 1970 ("NEPA"), 42 U.S.C. § 4331, et seq., Executive Order ("EO") 11,990, and the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531, et seq.  Defendants filed a cross-motion for summary judgment on these counts.  Plaintiffs later filed a motion to

---

¹ The current Secretary of the Interior, Ken Salazar, is substituted as a defendant under Fed. R. Civ. P. 25(d).

-2-

dismiss without prejudice for lack of jurisdiction Count VIII
involving the ESA claim, which the defendants oppose.[2]  Because
Count VIII is moot, it will be dismissed.  Because the defendants
complied with NEPA and the EO, judgment will be entered for them
on the remaining counts.

BACKGROUND

I.   HISTORY OF LEASING IN THE NPR-A

The NPR-A was first established in 1923 when President
Warren G. Harding set aside 23.5 million acres in northern Alaska
to be administered by the Navy as a future oil supply.[3]  (See
Pls.' Stmt. of Material Facts ¶ 2; Defs.' Stmt. of Material Facts
¶ 2.)  Administration of the NPR-A was transferred from the
Secretary of the Navy to the Secretary of the Interior in 1976,
when President Gerald Ford signed the National Petroleum Reserves
Production Act in 1976 ("NPRPA").  See 42 U.S.C. § 6502.  The
NPRPA prohibited production of petroleum or development leading
to such production in the NPR-A without prior authorization by
Congress.  See 42 U.S.C. § 6504(a).

---

[2] Defendants' motion for partial summary judgment on Count I
was granted in open court on September 15, 2000.  Counts V and VI
were voluntarily dismissed on August 28, 2001.

[3] The NPR-A was one of four regions that had been
specifically designated by Congress as Naval Petroleum Reserves,
set aside for the specific purpose of ensuring a supply of oil in
case of a national emergency.

-3-

Authorization for such production came in December 1980, when Congress passed the appropriations bill for the fiscal year ending September 30, 1981.  <u>See</u> P.L. No. 96-514 (1980).  The rider was passed as part of an effort to combat the difficulties caused by the energy crisis.  <u>See</u> 126 Cong. Rec. S29489 (1980)(statement of Sen. Stevens) ("[W]e can no longer delay efforts which would increase the domestic supply of oil and lessen our reliance on imports."); <u>see also</u> 126 Cong. Rec. H20533 (1980) (statement of Rep. McDade) ("We are in the middle of an energy crisis.").  At the time, a federal drilling program was already in place, but the government wanted to shift exploration efforts to the private sector because the federal program was of limited scope and was expensive to maintain.  <u>See</u> S. Rep. No. 96-985 at 34 (1980).  To help combat the problem, Congress decided to open up the NPR-A to private companies interested in oil and gas leasing.  <u>See</u> 126 Cong. Rec. 31,196 (1980)(statement of Sen. Stevens) ("The conferees have agreed to include language to expedite *private* leasing and exploration of the entire National Petroleum Reserve in Alaska.") (emphasis added).

When the appropriations bill for fiscal year 1981 was passed, a rider was attached to it stating that the Secretary of the Interior should carry out "an expeditious program" of oil and

-4-

gas leasing in the NPR-A.[4]  See P.L. No. 96-514 (1980).  Under

this directive, the Secretary held a number of lease sales in the

early 1980s.  (See Pls.' Stmt. of Material Facts ¶ 8; Defs.'

Stmt. of Material Facts ¶ 8.)  Before the third lease sale, the

Bureau of Land Management ("BLM") issued its Final Environmental

Impact Statement on Oil and Gas Leasing in the National Petroleum

Reserve in Alaska (February 1983).  (See Pls.' Stmt. of Material

Facts ¶ 8; Defs.' Stmt. of Material Facts ¶ 8.)

II.  THE CURRENT OIL AND GAS LEASING PROGRAM

In 1997, the BLM published a Notice of Intent to prepare an

Integrated Activity Plan/Environmental Impact Statement

("IAP/EIS") for the NPR-A.  See 62 Fed. Reg. 6797 (1997).  The

goal of the BLM was to determine whether or not new oil and gas

leasing should occur in a 4.6 million acre area ("NPR-A planning

area" or "planning area") located in the northeast section of the

region.  (See Northeast National Petroleum Reserve-Alaska, Final

Integrated Activity Plan/Environmental Impact Statement ("EIS")

at I-1 to 2.)  A draft analysis of the IAP/EIS was completed

within ten months, and for a 90-day period thereafter, the BLM

_____

[4] In this same bill, the federal drilling program was also
being funded again.  See H.R. Rep. No. 96-1147, at 32-33 (1980).
Though Congress wanted to eventually end this program, it knew
that there would be a time lag between passage of the
appropriations rider (which allowed private leasing in the NPR-A)
and actual implementation of the leasing programs.  Id. at 32.
Therefore, Congress continued to fund the government program in
order to ensure that drilling and exploration would occur in the
interim.

-5-

received public comments on the draft proposals.  (See 62 Fed.
Reg. 65,440 (1997).)  "BLM received approximately 7,000 written
comment messages and nearly 200 people testified at the public
meetings on the Draft IAP/EIS."  (Record of Decision ("ROD") at
23.)

After the close of this 90-day period, the Final EIS was
published on August 7, 1998.  (See 63 Fed. Reg. 42,431 (1998).)
The EIS included six alternative oil and gas leasing plans, among
them a "Preferred Alternative" plan, which would have opened up
87% of the planning area to oil and gas leasing.  (See EIS at IV-
B-1 to IV-G-83.)  After a last round of comments, the Secretary
issued the Record of Decision ("ROD") on October 7, 1998.  (Pls.'
Stmt. of Material Facts ¶ 28; Defs.' Stmt. of Material Facts
¶ 28.)  The plan set forth in the ROD not only adopted the
Preferred Alternative, but also set forth some conditions for
implementation, among them compliance with restrictions on
surface activities, consultations with local residents, and
continued protection of the wildlife environment.  (See ROD at
v.)

On April 5, 1999, BLM gave final notice of the initial lease
sale under the ROD and the initial lease sale took place on
May 5, 1999, during which BLM issued 133 leases.  (See Pls.'
Stmt. of Material Facts ¶ 29; Defs.' Stmt. of Material Facts
¶ 29.)  As of the time that plaintiffs filed their motion for

-6-

partial summary judgment, one company, ARCO Alaska, Inc., had applied for a permit to drill in the NPR-A.  (<u>See</u> Pls.' Stmt. of Material Facts ¶ 30; Defs.' Stmt. of Material Facts ¶ 30.)  BLM released an Environmental Assessment on ARCO's application, in which BLM made a Finding of No Significant Impact, and approved the application on January 28, 2000.  (<u>See</u> Pls.' Stmt. of Material Facts ¶ 30; Defs.' Stmt. of Material Facts ¶ 30.)  Since then, additional leases have been issued and oil companies continue to propose and conduct oil and gas activities in the planning area.  (<u>See</u> Joint Status Report, Docket Entry 150, at 2-3.)

<u>DISCUSSION</u>

"Summary judgment is appropriate when the pleadings and the evidence demonstrate that 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  <u>Feirson v. Dist. of Columbia</u>, 506 F.3d 1063, 1065 (D.C. Cir. 2007) (quoting Fed. R. Civ. P. 56(c).  Challenges to agency compliance with NEPA are brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. <u>Karst v. EPA</u>, 475 F.3d 1291, 1295 (D.C. Cir. 2007).  The EIS is reviewed under the APA to determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); <u>Communities Against Runway Expansion, Inc. v. FAA</u>, 355 F.3d 678,

685 (D.C. Cir. 2004).  "A court reviewing an EIS considers whether an 'agency took a 'hard look' at the environmental consequences of its decision to go forward with the project." Nuclear Info. & Res. Serv. v. NRC, 509 F.3d 562, 568 (D.C. Cir. 2007) (quoting Communities Against Runway Expansion, 355 F.3d at 685).  While the review must be careful, the ultimate standard is a narrow one.  A court is not to substitute its judgment for that of the agency.  Envtl. Def. v. United States Army Corps of Eng'rs, 515 F. Supp. 2d 69, 75 (D.D.C. 2007).

I.   NEPA

"Under NEPA, a federal agency must prepare an EIS for 'major Federal actions significantly affecting the quality of the human environment.'"  Duncan's Point Lot Owners Ass'n v. FERC, 522 F.3d 371, 376 (D.C. Cir. 2008) (quoting 42 U.S.C. § 4332(2)(C)). "This rather general legislative language has been explained and interpreted in guidelines published by the Council on Environmental Quality (CEQ), the agency established by NEPA to serve as a research, resource, and advisory body to the President."  Natural Resources Defense Council v. Morton, 388 F. Supp. 829, 832 (D.D.C. 1974), aff'd without opinion, 527 F.2d 1386 (D.C. Cir.), cert. denied, 427 U.S. 913 (1976).  The regulations promulgated by the CEQ are binding on all federal agencies implementing NEPA.  See 40 C.F.R. § 1500.3; Communities Against Runway Expansion, 355 F.3d at 681.

-8-

The purpose of NEPA is to incorporate environmental considerations into federal agencies decision-making processes by requiring agencies to prepare EISs and to inform the public that environmental considerations were taken into account during decision-making.  City of Dania Beach v. Federal Aviation Administration, 485 F.3d 1181, 1185 (D.C. Cir. 2007); see Weinberger v. Catholic Action of Hawaii/Peace Educ. Project, 454 U.S. 139, 143 (1981)).  However, NEPA's mandate is essentially procedural, and the Supreme Court has noted the impropriety of federal courts introducing additional procedural or substantive standards into the statutory provisions.  See City of Alexandria v. Slater, 198 F.3d 862, 866 (D.C. Cir. 1999); North Slope Borough v. Andrus, 642 F.2d 589, 598 (D.C. Cir. 1980). "Obedience to NEPA is a matter of the administrative agency acquiring and digesting useful information about the environmental ramifications of major federal projects." North Slope Borough, 642 F.2d at 599.  "The court's role is to ensure that the agency takes a 'hard look' at the environmental consequences of an action, not to interject its own judgment as to the course of action to be taken." Hammond v. Norton, 370 F. Supp. 2d 226, 240 (D.D.C. 2005) (citing Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976) (quoting Natural Resources Defense Council v. Morton, 458 F.2d 827, 838 (D.C. Cir. 1972))).

-9-

A.   <u>Count II: site-specific impacts</u>

Plaintiffs contend that defendants failed to comply with NEPA because the EIS supporting the decision to make land in the planning area available for oil and gas leasing did not contain site-specific assessments of environmental impacts.  (<u>See</u> Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. for Partial Summ. J. on Counts II-IV and VII-VIII of the First Am. Compl. ("Pls.' Mem. in Supp.") at 6.)  Defendants counter that the level of specificity of the EIS analysis was appropriate for the leasing stage given the available information and the phased nature of oil and gas development, and that NEPA and the CEQ regulations allow for deferring further analysis until more information is available. Defendants state that the Department of the Interior ("DOI")

> has followed an accepted procedure in using for the EIS all the currently available information to analyze the foreseeable site-specific impacts of leasing in the planning area, while still recognizing that additional information concerning the precise locations where the site-specific impacts may occur will simply not be available until after BLM issues leases and the lessees determine where, when and how they propose to conduct their field activities.

(Fed. Defs.' Mem. in Opp'n to Pls.' Mot. for Partial Summ. J. on Counts II-IV and VII-VIII of the First Am. Compl. & in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Opp'n & Mem. in Supp.") at 20.)

Where an agency administering oil and gas leasing on federal lands "chooses not to retain the authority to preclude all surface disturbing activities, then an EIS assessing the full

-10-

environmental consequences of leasing must be prepared at the point of commitment -- when the leases are issued." Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C. Cir. 1983); see also Wyoming Outdoor Council v. United States Forest Service, 165 F.3d 43, 49 (D.C. Cir. 1999) (holding that "point of irreversible and irretrievable commitment of resources and concomitant obligation to fully comply with NEPA do not mature until leases are issued"); Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1227 (9th Cir. 1988) (holding that "leases which 'do not reserve to the government the absolute right to prevent all surface-disturbing activity' cannot be sold without preparation of an EIS").  The action at issue here -- BLM's decision to issue leases which do not preclude all surface disturbing activity -- is a commitment of resources which requires an EIS assessing the environmental consequences.[5]

At the same time, the analysis in an EIS is governed by the CEQ regulations, which require that only the "reasonably foreseeable" environmental impacts be considered in an EIS:

> When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

---

[5] BLM, having issued leases permitting surface occupancy in the planning area, can attach stipulations to a lessee's surface use plan or permit to drill under 43 C.F.R. § 3131.3, but the leases do not reserve to the government the right to preclude all surface disturbing activity.

-11-

40 C.F.R. § 1502.22.  In addition, in the context of Outer
Continental Shelf Lands Act ("OCSLA") leasing, courts have
acknowledged that the limited information available at the
leasing stage necessarily limits the scope of the environmental
analysis.  For example, the Ninth Circuit in <u>Tribal Village of
Akutan v. Hodel</u>, noted that

> [w]e are least troubled by what may seem to be incomplete
> or speculative data at the lease sale stage.  Prior to
> exploration, it is difficult to make so much as an
> educated guess as to the volume of oil likely to be
> produced or the probable location of oil wells.

869 F.2d 1185, 1192 (9th Cir. 1989).  The court further stated
that "[t]he omission of speculative information from an
environmental impact statement prepared at the lease sale stage
is permissible; however, an environmental impact statement which
is incomplete due to the omission of ascertainable facts, or the
inclusion of erroneous information, violates the disclosure
requirement of 42 U.S.C. § 4332(2)(C)."  <u>Id.</u> at 1192 n.1.

The "rule of reason" requires that consideration be given to
practical limitations on the agency's analysis, such as the
information available at the time.  <u>See Transmission Access
Policy Study Group v. FERC</u>, 225 F.3d 667, 736 (D.C. Cir. 2000);
<u>North Slope Borough</u>, 642 F.2d at 600.  In <u>North Slope Borough</u>,
the D.C. Circuit reversed the district court in part and held
that the environmental impact statement prepared for a lease sale
pursuant to OCSLA was valid under NEPA.  However, the court noted

-12-

that the district court was correct in stating that "'[t]he

decision of how much detail to include is one for the agency

itself,' guided by a 'rule of reason.'"  Id. (quoting North Slope

Borough v. Andrus, 486 F. Supp. 326, 345 (D.D.C. 1979)).

The CEQ regulations also provide for "tiering" of

environmental analyses under certain circumstances.

> Agencies are encouraged to tier their environmental
> impact statements to eliminate repetitive discussions
> of the same issues and to focus on the actual issues
> ripe for decision at each level of environmental
> review (§ 1508.28).  Whenever a broad environmental
> impact statement has been prepared (such as a program
> or policy statement) and a subsequent statement or
> environmental assessment is then prepared on an action
> included within the entire program or policy (such as
> a site specific action) the subsequent statement or
> environmental assessment need only summarize the issues
> discussed in the broader statement and incorporate
> discussions from the broader statement by reference and
> shall concentrate on the issues specific to the
> subsequent action.  The subsequent document shall state
> where the earlier document is available.  Tiering may
> also be appropriate for different stages of actions.

40 C.F.R. § 1502.20

> "Tiering" refers to the coverage of general matters
> in broader environmental impact statements (such as
> national program or policy statements) with subsequent
> narrower statements or environmental analyses (such as
> regional or basinwide program statements or ultimately
> site-specific statements) incorporating by reference
> the general discussions and concentrating solely on
> the issues specific to the statement subsequently
> prepared.  Tiering is appropriate when the sequence of
> statements or analyses is:
>
> (a) From a program, plan, or policy environmental
> impact statement to a program, plan, or policy
> statement or analysis of lesser scope or to a site-
> specific statement or analysis.

-13-

(b) From an environmental impact statement on a
specific action at an early stage (such as need and
site selection) to a supplement (which is preferred) or
a subsequent statement or analysis at a later stage
(such as environmental mitigation).  Tiering in such
cases is appropriate when it helps the lead agency to
focus on the issues which are ripe for decision and
exclude from consideration issues already decided or not
yet ripe.

40 C.F.R. § 1508.28.  This circuit has approved of an agency's
use of the tiered approach in situations where completing a
program "involves many separate sub-projects and will take many
years."  Nevada vs. Department of Energy, 457 F.3d 78, 91 (D.C.
Cir. 2006).  In addition, the Tenth Circuit has approved of
tiering where the specificity that NEPA requires is not possible
until concrete specific proposals are submitted.  See Park County
Resource Council, Inc. v. Dep't of Agriculture, 817 F.2d 609, 624
(10th Cir. 1987).

Defendants state that they intend to conduct further site-
specific environmental analyses as to precise locations within
the area as specific leases are issued and the lessees seek
approval to conduct oil exploration and development.  Indeed, at
the time the defendants filed their brief, BLM had conducted
three additional environmental assessments as to specific
exploration proposals.  (See Defs.' Opp'n & Mem. in Supp. at 24
n.21.)  That defendants may continue to assess impacts as more
information becomes available does not indicate that defendants
failed to take a "hard look" at the environmental consequences of

-14-

its proposed action in the EIS.  Plaintiffs suggest that because defendants intend to conduct (and indeed have already conducted) further environmental assessments as proposals are submitted to explore and develop specific sites, the EIS must not have evaluated fully the environmental impacts of the decision to lease.  This argument fails to recognize the limitations on the information available to the agency at the time the EIS was prepared.

Because defendants did not know the exact location of exploratory wells and development at the time of the EIS, they were limited in their site-specific analysis.  Defendants make clear in the EIS and ROD that further site-specific analysis will be conducted prior to exploration in the planning area.  Lessees are required to apply to BLM for approval of their exploration plans and applications for permits to drill.  (See EIS at II-48, II-94.)  Defendants state that they "will conduct any necessary additional NEPA analyses tiered to the IAP/EIS" at those stages.  (See Defs.' Opp'n & Mem. in Supp. at 24.)  Indeed, defendants have conducted additional NEPA analyses when specific proposals for exploration and development have been submitted.  (See id. at 24 n.21.)

Plaintiffs specifically attack the sufficiency of the discussion of impacts to particular resources resulting from the Preferred Alternative.  (See Pls.' Mem. in Supp. at 15-21.)

-15-

Considering plaintiffs' arguments and weighing the EIS in its
entirety, it adequately addresses the foreseeable site-specific
impacts.  The EIS sufficiently addresses the various resources
and their location within the 4.6 million acre site, and the
impacts leasing will have on those resources so as to leave
defendants in a good position to consider the environmental
consequences of the proposed action.

Defendants state that the impact analysis in Section IV of
the EIS "is tied to particular resources that occur at various
sites throughout the planning area, as delineated earlier in
sections II and III of the EIS."  (Defs.' Opp'n & Mem. in Supp.
at 25.)  Because the vast area is not homogenous, the EIS
specifies sub-units designated as Land Use Emphasis Areas
("LUEAs") as a method of identifying resources specific to
certain areas.  While not every square foot of the 46 million
acres is analyzed, the "rule of reason" does not require it.

Section II of the EIS, "Alternatives," describes twelve
different LUEAs within the planning area and provides maps of
their respective locations.  LUEAs are described in Section II as
follows:

> Each alternative contains management actions
> for the entire planning area.  Certain parts
> of the area, however, are particularly important
> because of their surface-resource values.  In
> the IAP/EIS, these areas are called Land Use
> Emphasis Areas (LUEA's), and much of the
> discussion of the alternatives is organized to
> show what management is proposed in each

> alternative for each LUEA.  Nearly all LUEA's
> identify specific resource values, such as
> important bird or caribou habitat, that are
> linked to specific pieces of land.  In this way,
> BLM will be able to focus specific management
> measures for each resource on the appropriate
> lands.  Some alternatives propose special
> designations for some LUEA's, and nearly all
> LUEA's have stipulations identified to protect
> specific resources within them.

(EIS at II-1.)  BLM's description and mapping of the location of
the LUEAs in the EIS operate to identify areas with specific
resources within the planning area.  (See id. at II-1 to 17.)
The LUEAs are named as follows:  Teshekpuk Lake Watershed, Goose
Molting Habitat, Spectacled Eider Breeding Range, Teshekpuk Lake
Caribou Habitat, Fish Habitat, Colville River Raptor, Passerine,
and Moose Area, Umiat Recreation Site, Scenic Areas, Pik Dunes,
Ikpikpuk Paleontological Sites, Kuukpik Corporation Entitlement
and Potential Colville Wild and Scenic River.  (See id. at II-1
to II-3.)

Section II also includes a discussion of the alternatives
and provides maps of the proposed land uses and restrictions for
each alternative.  (See id. at II-19 to 28.)  The discussion and
maps show what type of activity would be permitted under each
alternative in each location in the planning area.  (See id.)
There are also a number of stipulations governing the
alternatives which demonstrate which types of activities would be
permitted under each alternative in specific locations within the
planning area.  (See id. at II-29 to II-48.)

-17-

Section III, "Description of the Affected Environment," also provides specific information as to the location of resources. This includes description and mapping of the density of particular types of birds (see id. at III-B-18 to 38) and mammals (see id. at III-B-39 to 51).  The EIS discusses and maps, among other resources, the location of soils (see id. at III-A-34 to 36), paleontological resources (see id. at III-A-39 to 40), water (see id. at III-A-46 to 49), fish (see id. at III-B-5 to 11), and air quality.  (See id. at III-A-57.)

Having discussed the alternatives and the types of activities permitted in certain locations and having described and identified the location of various resources within the planning area, the EIS then describes the impact of the action on those resources in Section IV.  Section IV, "Environmental Consequences," describes the effect of various activities on resources under each alternative.

Plaintiff argues that the discussion of impacts to soils is insufficient because it discusses "the overall impact by describing the total area expected to be affected throughout the planning area" and does not mention site-specific impact.  (See Pls.' Mem. in Supp. at 15.)  A review of the EIS, however, reveals that it adequately considers environmental impacts to soils, explaining that the impact to soils is largely one of erosion due to activities disturbing vegetation.  (See EIS at IV-

G-1 to 2.)  The analysis provided is sufficient to demonstrate that the BLM considered the environmental ramifications of its proposed project on soils.

Plaintiff attacks the section concerning paleontological resources for reasons similar to those for which it challenges the discussion of impacts to soils -- that the impact of various activities is "described by reference to the total number of acres hypothesized to be disturbed under the alternative; no sites or locations for any paleontological resources are identified or impacts to such specific resources described." (Pls.' Mem. in Supp. at 16.)  As defendants explain, the most paleontological resources are deeply buried underground and, as such, are protected by nature.  (See EIS at III-A-40.)  Further, their specific location has not been determined and their existence is generally homogenous across the planning area.  (See id. at III-A-39 to 40).  In addition, impacts upon this resource are mitigated by the stipulation which requires that a paleontological resources survey be conducted of any site that is proposed for ground-disturbing activities.  (See ROD at 43, Stipulation 74.)  BLM's consideration of the impacts to paleontological resources meets the requirement under NEPA to consider environmental effects of proposed actions in the decision-making process.

-19-

With respect to the section on water resources and water quality, plaintiffs argue that while the there is a general discussion of how development activities such as building ice roads using lake water is provided, the "impacts are summarized only by describing the hypothesized total level of activity." (See Pls.' Mem. in Supp. at 16.)  Plaintiffs concede, however, that there is specific discussion of the potential impacts of an oil spill to the Colville River and Teshekpuk Lake.  (See id.) The EIS includes an appropriate level of analysis with respect to water resources for BLM's decisionmaking process.  For example, it analyzed the impacts from water extraction for ice roads and pad, water impoundment and erosion effects around structures and roads, and spillage of oil and saltwater.  (See EIS at IV-G-12 to 13.)  Although water extraction from particular lakes was not specified, the location and depth of the lakes are mapped in the EIS (see id. at III-A-49), and the discussion regarding water extraction impacts is related to the depth of the lake at issue. (See id. at IV-G-8.)  Therefore, while the lakes are not all analyzed individually, a task which would be speculative given the fact that the location of oil and gas activities was unknown, the analysis is sufficient for the "hard look" requirement.  As with other resources, BLM chose to include stipulations in the Preferred Alternative which minimize the impact of oil and gas development on this resource, such as excluding certain areas

from leasing or occupancy.  (See id. at IV-G-6; ROD at 36-37, 43-
44 (Stipulations 39, 41, 70, 78).)  In sum, the water resource
analysis provided sufficient information for BLM's consideration
of the environmental effects of the proposed action.

Plaintiffs further contend that the air quality discussion
is lacking because it "treats all of the North Slope as uniform"
and fails to discuss whether localized industrial emissions will
harm resource values of specific sites like the Umiat Recreation
Site LUEA, Scenic Areas LUEA, or Pik Dunes LUEA.  (See Pls.' Mem.
in Supp. at 16.)  The EIS, however, states that localized impacts
would be minimal and would remain within air quality standards.
(See EIS at IV-G-15 to 16.)  Given BLM's determination that the
impacts are not significant, further analysis as to specific
sites is not necessary under NEPA as the regulation provides that
"[t]here shall only be brief discussion of other than significant
issues."  40 C.F.R. § 1502.2(b).

As to fish, plaintiffs argue that there is only "general
discussion of impact mechanisms with no site-specific assessment"
even though "the FEIS elsewhere recognizes that some areas are
particularly important for fish."  (See Pls.' Mem. in Supp. at
16.)  Defendants concede that because the location of activities
was not known at the leasing stage, "the particular lakes where
the impacts to fish would occur is not delineated in the impacts
analysis."  (Defs.' Opp'n & Mem. in Supp. at 33.)  Defendants

-21-

further state that "[i]t would be unnecessary and indeed impossible to study each one of these thousands of water bodies individually for purely speculative impacts from development that may never occur in or near that particular location." (Id.)  The EIS's analysis of the impacts is sufficient to satisfy NEPA because it provides the various activities and their likely impacts on fish in the planning area.  (See EIS at IV-G-21 to 23.)  Requiring defendants to provide analysis with respect to each individual water body without knowing where the activities would occur would be unreasonable and speculative and would be beyond NEPA's requirements.

Plaintiffs argue that the discussion regarding vegetation, including wetlands, is also generalized and not site-specific, but also attacks the sufficiency of the EIS on the basis that neither Chapter III nor IV describes the location of critical wetlands resources.  (See Pls.' Mem. in Supp. at 17.)  Plaintiffs point to the fact that the FWS, the Environmental Protection Agency ("EPA") and the Army Corps of Engineers provided comments to the draft EIS that criticized it for the lack of information concerning wetlands.  (See id. at 17-18.)  Although in response to the comments BLM included in the EIS a table of vegetation types in the planning area based on satellite data, plaintiffs contend that BLM should have identified where different kinds of vegetation were located and assessed their value at particular

-22-

sites and that the EIS and ROD improperly defer the task of
identifying key wetlands until after leasing.  (See id. at 19
(citing ROD at 38 (Stipulation #46)).)  Plaintiff further argues
that "the EIS merely describes how vegetation is generally
affected by oil development activities, . . . and then summarizes
the total estimated affect by describing the total number of
acres expected to be disturbed by the hypothesized level of
development under each alternative."  (Pls.' Mem. in Supp. at
19.)

     The EIS provides the necessary information for BLM's
consideration of environmental effects in its decision-making
with respect to what areas to make available to leasing based on
the analysis conducted as to vegetation.  BLM discussed the
different impacts on different vegetative varieties and discussed
the proportion of impacts to different land-cover classes based
on certain assumptions.  (See EIS at IV-G-16 to 18.)

     With respect to wetlands, the EIS adequately identified the
amount and distribution of wetlands throughout the planning area
as well as the impacts of the various alternatives.  It discussed
impacts on wetlands of overland moves and seismic exploration.
(See id. at IV-G-16.)  It also discussed the proportion of
impacts likely to occur to each land-cover class (see id. at IV-
B-5) as well as impacts on wetlands due to changes to moisture
regimes.  (See id. at IV-G-18.)  In sum, the EIS's discussion of

-23-

the impacts to vegetation and wetlands was sufficient for a decision that considered the environmental impacts to those resources.

Lastly, the plaintiff argues that "the reader [of the EIS] learns only the general mechanisms though which impacts might occur and receives an estimate of the total level of impact based on a hypothetical number of wells located somewhere in the 4.6 million acres of the planning area."  (Pls.' Mem. in Supp. at 19.)

The discussion in Section IV, read in conjunction with Sections II and III, as well as the EIS as a whole, provides sufficient analysis of the environmental effects of the proposed alternatives on the various areas within the NPR-A.  This satisfies the "hard look" requirement of NEPA, <u>Kleppe</u>, 427 U.S. at 410 n.21, as well as the twofold purpose of NEPA to ensure that a federal agency considers environmental consequences in making its decision and to inform the public that the agency has done so.  <u>See</u> <u>Weinberger</u>, 454 U.S. at 143.  Accordingly, plaintiffs' motion for summary judgment on Count II will be denied and defendants' cross-motion for summary judgment on Count II will be granted.

B.   <u>Count III: wilderness</u>

Plaintiffs allege in Count III that the EIS fails to comply with NEPA and violates the APA because defendants have failed to

-24-

treat wilderness as a discrete resource and have failed to
consider adequately the impacts of the proposed leasing program
on the wilderness of the area.

Plaintiffs argue that while Congress and DOI have recognized
that the planning area has many areas with substantial wilderness
values, defendants have not taken a "hard look" at the impact
because the EIS does not focus on "particular wilderness values
of any portion of the planning area, their relative wilderness
value, or the ways in which different alternatives would affect
those relative values." (Pls.' Mem. in Supp. at 25.) Plaintiffs
contend that the EIS is inadequate because it does not describe
or rate the wilderness character of different parts of the NPR-A
and does not provide "what the actual loss of wilderness will be
under a particular Alternative, or if another Alternative would
preserve more of the especially valuable wilderness sites than
would the Preferred Alternative." (Id. at 26.) According to
plaintiffs, the EIS is insufficient because it "does not inform
the reader what options for formal wilderness designation under
the Wilderness Act will be foreclosed to Congress by oil and gas
leasing." (Id.)

> In the Wilderness Act, Congress defined wilderness as
>
> an area where the earth and its community of life are
> untrammeled by man, where man himself is a visitor who
> does not remain. An area of wilderness is further
> defined to mean in this chapter an area of undeveloped
> Federal land retaining its primeval character and

influence, without permanent improvements or human
habitation, which is protected and managed so as to
preserve its natural conditions and which (1) generally
appears to have been affected by the forces of nature,
with the imprint of man's work substantially
unnoticeable; (2) has outstanding opportunities for
solitude or a primitive and unconfined type of
recreation; (3) has at least five thousand acres of
land or is of sufficient size as to make practicable
its preservation and use in an unimpaired condition;
and (4) may also contain ecological, geological, or
other features of scientific, educational, scenic, or
historical value.

16 U.S.C. § 1131(c).  While conceding that the Wilderness Act

does not apply to this case, plaintiffs argue that this

definition is applicable in determining whether defendants

complied with NEPA's requirements.  In support of their position

that when agency action threatens "loss of wilderness," the loss

must be analyzed under NEPA, plaintiffs cite Smith v. United

States Forest Service, 33 F.3d 1072, 1079 (9th Cir. 1994), State

of California v. Bergland, 483 F. Supp. 465 (E.D. Cal. 1980) and

State of California v. Block, 690 F.2d 753 (9th Cir. 1982)

(affirming in part and reversing in part State of California v.

Bergland).  Defendants attempt to distinguish those cases on the

basis that each involved areas subject to the wilderness review

requirement of the Wilderness Act, unlike the NPR-A, which is

exempt from the wilderness review requirement.  (See Defs.' Opp'n

& Mem. in Supp. at 40, n.37.)  However, plaintiffs respond that

while the NPR-A is not subject to the Wilderness Act, these cases

support the conclusion that wilderness must be analyzed as a

-26-

resource under NEPA because of the wilderness values that could be lost to development.  (See Pls.' Opp'n & Reply at 44.)

Assuming for the sake of argument that defendants were required to consider wilderness values in the EIS, the EIS nevertheless adequately considers wilderness in its analysis. First, the EIS includes a discussion regarding alternatives that were considered but eliminated from the detailed analysis.  Among these is the alternative of formally designating the NPR-A as a wildlife refuge or wilderness.  (See EIS at II-51 to 52.)  In addition, while the EIS does not have a separate "wilderness" section, the EIS includes in its description of the "affected environment" paleontological resources (see EIS at III-A-40), biological resources (see EIS at III-B-1 to 63), including "significant bird concentrations" (EIS at III-B-11 to 39) and mammals in the planning area (see EIS at III-B-39 to 47), recreation and visual resources (see EIS at III-C-47), and "previous planning efforts concerning Wild and Scenic Rivers inventories and studies."  (See EIS at III-C-49 and Appx. G.) The EIS also addresses the environmental consequences of the proposed action and its alternatives on the wilderness resources, including water quality, vegetation, fish, birds, mammals, endangered and threatened species, and recreation and visual resources.  (See EIS at IV-B-1 to 19; EIS at II-59, Table II.D-2.)  The EIS also complies because it addresses comments that the

planning area should either be designated a wilderness area or a national wildlife refuge, it sufficiently describes the "affected environment," including those values that plaintiff refers to as "wilderness characteristics," and it assesses the "environmental consequences" of the proposed action and its alternatives.

In addition to the resources addressed in the EIS, the DOI also considered past wilderness studies in preparing the EIS and reaching its decision. (Administrative R. at 961; Defs.' Opp'n & Mem. in Supp. at 44-46.) Assuming for argument's sake that defendants were required to consider wilderness values in the EIS, the EIS provides the information necessary for defendants to take the requisite "hard look" at the environmental impacts on wilderness. Accordingly, plaintiffs' motion for summary judgment on Count III will be denied and defendants' cross-motion for summary judgment on Count III will be granted.

C.    Count IV: cumulative impacts

Plaintiffs contend that defendants have violated NEPA because the EIS fails to consider the cumulative impacts of the decision to conduct oil and gas leasing in the NPR-A. The regulations promulgated by the Council for Environmental Quality provide the definition for cumulative impact:

> "Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such

other actions.  Cumulative impacts can result from
individually minor but collectively significant actions
taking place over a period of time.

40 CFR § 1508.7.  NEPA and the CEQ regulations require
comprehensive analysis of the cumulative impact of proposed
actions.  See Tomac v. Norton, 433 F.3d 852, 864 (D.C. Cir.
2006); National Wildlife Federation v. F.E.R.C., 912 F.2d 1471,
1476 (D.C. Cir. 1990); 40 C.F.R. § 1508.25(c).  "The purpose of
this requirement is to prevent agencies from dividing one project
into multiple individual actions 'each of which individually has
an insignificant environmental impact, but which collectively
have a substantial impact.'"  Hammond, 370 F. Supp. 2d at 240
(quoting Natural Resources Defense Council, Inc. v. Hodel, 865
F.2d 288, 297-298 (D.C. Cir. 1988) (internal citations omitted)).

Plaintiffs first argue that the EIS failed to consider the
synergistic effects of development -- in other words, how the
cumulative effects interact to create environmental impacts that
are greater than the sum of the individual effects.  (See Pls.'
Mem. in Supp. at 31.)  Plaintiffs argue that defendants were
required to consider not only the incremental effects, but also
the synergistic effects of the proposal.  The incremental
effects, plaintiffs point out, are merely a sum of all of the
parts, whereas the synergistic effects are the effects resulting
from the interaction of the various parts such that the total

effects are greater than the sum of the individual effects. (See Pls.' Opp'n & Reply at 31.)

Defendants respond that they considered the incremental impact of the action and the overall effects of individual impacts. (See Defs.' Opp'n & Mem. in Supp. at 49.) BLM concedes it did not consider the "synergistic" impacts as defined by plaintiffs because BLM had no information to suggest that synergistic impacts existed which required further analysis, citing the declaration of Raymond Emerson, an Environmental Special Assistant with the Minerals Management Service of the DOI. (See Defs.' Reply at 18.) Emerson states that the EIS considered synergistic impacts "where there was an indication in the scientific literature or from field observations of agency resource specialists that such impacts might possibly occur (such as with thermokast or global warming reactions, or behavioral responses of caribou to pipelines and roads)." (Emerson Decl. ¶ 6.) He further states that "[w]here synergistic impacts were not specifically described in the EIS, it was because there were no studies and no information that would lead the agency to expect that such impacts could reasonably be anticipated to occur. Further discussion of synergistic impacts was not included in the EIS because it could only have been based on speculation which would not have been reasonable to include in the cumulative impacts section." (Id.)

-30-

Consideration of synergistic impact is not required where no such impact will result from the proposed agency action.  The Supreme Court has stated that "when several proposals . . . that <u>will</u> have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together.  Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action."  <u>Kleppe</u>, 427 U.S. 390 at 410 (emphasis added; footnotes omitted); <u>see also</u> <u>Hammond</u>, 370 F. Supp. 2d at 245-246 (no comprehensive EIS necessary where agency's determination that a project would not have cumulative or synergistic effects was accepted); <u>Sierra Club v. Watkins</u>, 808 F. Supp. 852, 864 (D.D.C. 1991) (agency not required to prepare a programmatic EIS where there was no evidence that proposed action would have a cumulative or synergistic effect).  BLM has explained that the synergistic impact was not considered as to all resources because such impact could not reasonably be anticipated to occur.  An agency is not required to engage in speculation in the EIS, <u>Hodel</u>, 865 F.2d at 295 (stating that agencies are not required to consider alternatives that are remote and speculative), but is required to address only relevant issues.  <u>See</u> <u>id.</u> at 294.  BLM's decision not to include synergistic impact is entitled to judicial deference "as long as

-31-

the agency's decision is 'fully informed' and 'well-considered. . ..'" Id.

        The question remains whether BLM adequately considered the cumulative impact of the proposed actions.  With respect to this issue, plaintiffs first assert that the EIS subsection addressing birds and endangered species does not discuss how the impacts from the previous North Slope development[6] will interact with the proposed development in the NPR-A.  Plaintiffs also argue that the subsection on fish is deficient because it only addresses the effects on fish in the planning area, not the entire cumulative area.  Lastly, plaintiffs contend that the cumulative impact analysis in the EIS lacks sufficient detail to meet the "hard look" requirement.

        A review of the EIS reveals that it compares the cumulative impacts of the various alternatives on birds.  (See EIS at IV-H-32 to 33.)  The EIS notes that "[c]ontribution of [Alternative E] to cumulative disturbance and oil spill effects is expected to be 75-90 percent for goose populations" (id. at IV-H-32), but that because the Goose Molting Habitat Area is not open to oil and gas development, "contribution of this alternative to cumulative disturbance and oil spill effects is expected to be less than 5-10 percent above Alternative A." (Id. at IV-H-33.)  Similarly,

_____

        [6] The previous development is North Slope oil and gas development on a five hundred square mile area adjacent to the NPR-A planning area.  (Pls.' Mot. for Partial Summ. J. at 28.)

-32-

the EIS provides sufficient analysis of the cumulative impacts on
Eiders (see id. at IV-H-17, 36 to 37) and fish (see id. at IV-H-
7) and is sufficiently detailed.

In sum, the EIS provides the necessary information for the
agency to consider the cumulative impacts of the proposed actions
on the environment so as to provide a reasoned basis for deciding
whether and how to proceed with the proposed course of action.
Accordingly, plaintiffs' motion for summary judgment on Count IV
will be denied and defendants' cross-motion for summary judgment
on Count IV will be granted.

II.  COUNT VII: EXECUTIVE ORDER 11,990

Plaintiffs allege that the BLM has violated Executive Order
11,990 ("EO 11,990") by failing in their EIS to identify
wetlands, to analyze thoroughly impacts to wetlands, to conduct a
practicability analysis and make a practicability finding, and to
formulate and thoroughly discuss measures to minimize harm to
wetlands.  (See Pls.' Mem. in Supp. at 40-48.)

Defendants respond that plaintiffs' claim fails because the
challenge under EO 11,990 is untimely, compliance with EO 11,990
is not enforceable by a private cause of action, and EO 11,990
does not apply at the leasing stage of oil and gas development
addressed in the EIS.  (See Defs.' Opp'n & Mem. in Supp. at 62.)
Defendants further contend that DOI fulfilled the aim of EO
11,990 in its consideration of wetlands issues.  (See id.)

-33-

EO 11,990 provides:

> [E]ach agency, to the extent permitted by law, shall
> avoid undertaking or providing assistance for new
> construction located in wetlands unless the head of
> the agency finds (1) that there is no practicable
> alternative to such construction, and (2) that the
> proposed action includes all practicable measures to
> minimize harm to wetlands which may result from such
> use.  In making this finding the head of the agency
> may take into account economic, environmental and
> other pertinent factors.

Exec. Order No. 11,990, § 2a, 42 Fed. Reg. 26,961 (May 24, 1977).

EO 11,990 further provides that "[t]he term 'new construction'

shall include draining, dredging, channelizing, filling, diking,

impounding, and related activities and any structures or

facilities begun or authorized after the effective date of this

Order."  Id. at § 7(b).

A.   Timeliness of plaintiffs' claim

Defendants argue that plaintiffs' claim should be dismissed

as untimely because plaintiffs failed to raise the issue at any

of the three public comment opportunities provided by BLM before

BLM finalized its NEPA documentation.  (See Defs.' Opp'n & Mem.

in Supp. at 62.)

Plaintiffs respond that they are not precluded from raising

defendants' alleged lack of compliance with EO 11,990 because

defendants were aware of their duty to comply with the EO,

plaintiffs were not required to alert defendants of its legal

obligations, and plaintiffs and several federal agencies noted

-34-

the lack of wetlands analysis in the draft EIS.  (See Pls.' Opp'n
& Reply at 62-63.)

Vermont Yankee Nuclear Power Corp. v. Natural Resources
Defense Council, Inc., 435 U.S. 519 (1978), upon which defendants
rely for the proposition that plaintiffs were required to raise
compliance with EO 11,990 during the comment periods, held that
though NEPA requires an agency to consider every significant
aspect of the environmental impact of a proposed action, it was
nevertheless the intervenors' responsibility to structure their
participation so that it was meaningful and alerted the agency to
the intervenors' position and contentions.  See id. at 553.
Defendants also rely on Northside Sanitary Landfill, Inc. v.
Thomas, 849 F.2d 1516 (D.C. Cir. 1988), in which the court
declined to address the plaintiff's objections to the EPA during
the rulemaking process, because they were not properly presented
in that plaintiff merely filed 420 pages of documents without
specifying why it considered those documents or anything in them
relevant to the rulemaking procedure.  See id. at 1519-20.

Vermont Yankee and Northside Sanitary Landfill can be
distinguished from this case because in those cases, the
plaintiffs failed to raise during the NEPA public comment process
any factual argument regarding the substantive content of the
EIS.  By contrast, plaintiffs and federal agencies here noted in
their comments that the draft EIS failed to analyze the potential

-35-

effects on wetlands.  Defendants concede that plaintiffs and
government agencies raised concerns regarding defendants'
analysis regarding wetlands, but argue that because there was no
mention of EO 11,990 or its required finding of "no practical
alternatives," plaintiffs cannot rely on it as a basis for a
claim now.  (Defs.' Opp'n & Mem. in Supp. at 63-64, nn.51-53.)
In Northwest Environmental Defense Center v. Bonneville Power
Admin., 117 F.3d 1520, 1535 (9th Cir. 1997), the court held that
defendants had "a duty to comply with the public participation
processes regardless of whether participants complain of
violations."  Id.  Because defendants are required to meet their
legal obligations under EO 11,990 regardless of whether the
executive order was raised at the public participation level and
because plaintiffs and others raised specific factual issues
concerning wetlands, plaintiffs' challenge is not barred for
failure to raise the specific requirements of EO 11,990 during
the administrative proceedings.

     B.   Reviewability of compliance with EO 11,990

     Defendants contend that compliance with EO 11,990 is not
reviewable because it does not have the force and effect of law
and does not create a private right of action.  (See Defs.' Opp'n
& Mem. in Supp. at 64.)  Plaintiffs respond that EO 11,990 is
reviewable under the Administrative Procedure Act and that it

-36-

carries the force of law because it has statutory foundation in NEPA. (See Pls.' Reply & Opp'n at 52-54.)

National Wildlife Federation v. Babbitt, Civil Action No. 88-0301 (WBB), 1993 WL 304008, at *7 (D.D.C. 1993), concluded that EO 11,990 is reviewable under the APA. That opinion persuasively decides that EO 11,990 has the force and effect of law because "[t]he President acted under NEPA's implied authorization when he issued Executive Order 11, 990." Id. at *8. That decision also persuasively held that judicial review was available under the APA because EO 11,990 placed substantive limits on agency discretion in that it imposes certain non-discretionary duties on the heads of agencies. See id. In sum, EO 11,990 is reviewable under the APA.

C.   Application of EO 11,990

Defendants maintain that EO 11,990 has not been violated because it does not apply at this stage in the decision-making process because the decision involves no "new construction" as defined by EO 11,990. (See Defs.' Opp'n & Mem. in Supp. at 68-69.) Defendants maintain that new construction would occur only at the oil and gas exploration and development stages, which will require issuance of specific permits and rights-of-way for ground-impacting activities, and that BLM will conduct additional NEPA analysis at that point, including the factors in EO 11,990. (See id. at 69.)

-37-

Plaintiffs argue that EO 11,990 applies at the oil and gas leasing stage because leasing is a "related activity" under EO 11,990's definition of "new construction" and because the action constitutes "providing assistance for new construction."  (Pls.' Reply & Opp'n at 60 (quoting EO 11,990).)

There is support for the notion that leasing constitutes construction under the EO 11,990 definition which includes "draining, dredging, channelizing, filling, diking, impounding, and related activities[.]"  Exec. Order No. 11,990, § 7b, 42 Fed. Reg. 26,961 (May 24, 1977).  See Nat'l Wildlife Federation, 1993 WL 304008, at *7 (stating that "permitting 'construction' would include coal leasing").  In addition, BLM's decision to lease land for oil and gas exploration and development constitutes "providing assistance for new construction located in wetlands," Exec. Order No. 11,990 at § 2a, because it is the first step toward exploration and development, and because as a result of BLM's decision, BLM has ensured that some construction on the lands will occur.  Although BLM will be able to place conditions on development of specific leases when making specific decisions on exploration and development, it will not be able to prohibit development completely.  Accordingly, BLM's decision has provided assistance for new construction, and EO 11,990 applies at this stage in the decision-making process.

-38-

D.   Adequacy of wetlands consideration in EIS under EO
     11,990

Defendants assert that DOI "compl[ied] with the policy of
[EO 11,990] to identify wetlands and 'consider factors relevant
to a proposal's effect on the survival and quality of the
wetlands.'"  (Defs.' Opp'n & Mem. in Supp. at 69 (quoting EO
11,990 § 5).)  Plaintiffs respond that defendants failed to
address EO 11,990's tasks in that it did not identify the
wetlands at risk, thoroughly examine the impacts to wetlands,
make a finding that there was no practicable alternative, or
include all practicable measures to minimize harm to wetlands.
(See Pls.' Mem. in Supp. at 40-48.)

The EIS provides in the section entitled "Description of the
Affected Environment" the amount and distribution of wetlands as
well as the species of wetlands vegetation.  (EIS at III-B-1 to
2, 5.)  The EIS discusses the effects of overland moves and
seismic exploration on wet tundra (see id. at IV-B-4 and IV-G-
16), notes that seismic activities would result in "minor
diversion of shallow water tracts and limited ponding in places
where track depression compresses the organic mat sufficiently to
alter the thermal regime, melt surficial ground ice, and alter
the native vegetation" (see id. at IV-B-2 to 3), provides the
proportion of impacts that would occur to each land cover
category (see id. at IV-B-5), and considers the changes in

moisture regimes of tundra resulting from oil development.  (See id. at IV-C-15 and IV-G-18.)

The EIS satisfies the requirements of EO 11,990 because it provides adequate analysis of the effects of the proposed actions on wetlands in the sections concerning water resources, vegetation and waterfowl habitat.  Accordingly, plaintiffs' motion for summary judgment on Count VII will be denied and defendants' cross-motion for summary judgment on Count VII will be granted.

III. COUNT VIII: ENDANGERED SPECIES ACT

Plaintiffs moved for summary judgment on this claim seeking a ruling that the Secretary had violated the ESA by failing to designate critical habitat for the spectacled eider when he listed it as threatened in 1993 and for the Steller's eider when he listed it as threatened in 1997.  Plaintiffs also argued that the Secretary violated the ESA by deciding to proceed with leasing in the planning area without addressing impacts to the eider critical habitat in its consultation with FWS regarding the impacts of the proposed oil leasing program.  (See Pls.' Mem. in Supp. at 48.)

After plaintiffs filed the motion for summary judgment, the Secretary published final rules designating critical habitat for the eider species and did not designate any critical habitat within the Reserve.  Plaintiffs then filed a motion to dismiss

Count VIII without prejudice, arguing that their claims are now moot and should be dismissed without prejudice.  (See Pls.' Mot. to Dismiss Count VIII for Lack of Jurisdiction ("Pls.' Mot. to Dismiss") at 1.)

Defendants argue that the portion of Count VIII alleging that FWS violated the law by failing to designate critical habitat for the spectacled eider and the Steller's eider should be dismissed with prejudice as moot.  Defendants further argue that FWS is entitled to summary judgment on the remaining part of Count VIII alleging that BLM and FWS consultations on the proposed leasing program and decision to proceed were inadequate because they failed to consider the impacts on critical habitat.

The parties agree that plaintiffs' claim that FWS violated the ESA by failing to designate critical habitat for the spectacled eider and the Steller's eider is moot.  The parties disagree as to whether that claim should be dismissed with or without prejudice.  A dismissal on mootness grounds is without prejudice to future suits on the merits of the same claim.  See Payne v. Panama Canal Co., 607 F.2d 155, 158 (5th Cir. 1979) (holding that "[t]he dismissal without prejudice of the prior actions on grounds of mootness does not serve as a final adjudication on the merits so as to bar this action"); DiGiore v. Ryan, 172 F.3d 454, 466 (7th Cir. 1999), overruled on other grounds, Whetsel v. Network Property Services, LLC, 246 F.3d 897

(7th Cir. 2001) (stating that "dismissals based on justiciability issues should preclude only relitigation of the same justiciability issue, but not future suits based on the merits of the same claim"); McCarney v. Ford Motor Co., 657 F.2d 230, 234 (8th Cir. 1981) (stating that a dismissal based on concepts of justiciability, which includes the questions of advisory opinions, mootness and ripeness, does not preclude a second action on the same claim if the justiciability problem can be overcome).  Accordingly, the court will grant plaintiff's motion to dismiss without prejudice as moot the allegation in Count VIII that FWS violated the ESA by failing to designate critical habitat for the spectacled eider and the Steller's eider, and will deny as moot plaintiffs' and defendants' motions for summary judgment on this allegation.

The remaining allegation in Count VIII involves plaintiffs' claim that the FWS's and BLM's consultation for the leasing program violated the ESA by not considering the impacts on critical habitat because it was conducted before critical habitat was designated.  Plaintiffs argue that the claim must be dismissed as moot because there is no effective relief that can be granted now that defendants have designated critical habitat, none of which falls within the leasing area at issue.  Defendants argue that their motion for summary judgment should be granted because "even if, assuming arguendo, the 'not prudent' critical

-42-

habitat determination for the eiders had not been revised in a subsequent rule, Plaintiffs['] basic legal premise regarding the legality and validity of the consultation and Biological Opinion would still be incorrect." (Defs.' Opp'n to Pls.' Mot. to Dismiss at 11.)  While this may be true, it does not change the fact that the court is not permitted to issue advisory opinions. See NRDC v. NRC, 680 F.2d 810, 814 (D.C. Cir. 1982).  Because critical habitat has been designated and it has not been designated in the leasing area at issue, plaintiffs' claims in Count VIII are moot.  Accordingly, plaintiffs' motion to dismiss the remaining portion of Count VIII without prejudice as moot will be granted and defendants' and plaintiffs' motions for summary judgment will be denied as moot.

## CONCLUSION

Because defendants have complied with the requirements of NEPA and EO 11,990, plaintiffs' motion for partial summary judgment on Counts II through IV and VII will be denied and defendants' cross-motion for partial summary judgment on those counts will be granted.  Because Count VIII is now moot, plaintiffs' motion to dismiss Count VIII without prejudice will be granted and plaintiffs' and defendants' motions for summary judgment on Count VIII will be denied as moot.  An appropriate order accompanies this Memorandum Opinion.

-43-

SIGNED this 25th day of March, 2009.

_____/s/_____

RICHARD W. ROBERTS
United States District Judge
